## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHARLES N.J. RUGGIERO, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:23-CV-00191 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL D. GREELEY, | ) | |
| | ) | |
| Defendant. | ) | February 11, 2025 |

## PLAINTIFF'S OBJECTION TO VALUATION REPORT

Pursuant to Section 2(B) of the Settlement Agreement between Plaintiff Charles N.J. Ruggiero ("Ruggiero") and Defendant Paul D. Greeley ("Greeley"), Ruggiero hereby objects to the Report ("Report") of John G. Plumpe (the "Appraiser") dated January 28, 2025, regarding the monetary value of the use of the names Ohlandt and Perle and the goodwill associated therewith in Greeley's on-going practice of law as Ohlandt Greeley & Perle LLP ("OGP").

Ruggiero reserves the right to submit evidence and argument at an evidentiary hearing.

### SUMMARY OF OBJECTION

1.     The Report offers two alternative scenarios, only one of which ("Scenario II") is based on historical data as of the valuation date, which data was subjected to scrutiny in the Examiner's forensic examination; the other ("Scenario I") is based on ex post facto files untimely and improperly uploaded to the Appraiser's portal after the fact-gathering process had been concluded, which files have not been subject to any scrutiny and are not an indicator of value as of the valuation date.  Thus, Ruggiero objects to the use of the Scenario I data, and submits that the valuation must be based on the reliable and relevant Scenario II data.

2.      The Report dramatically understates the value to Greeley of his ongoing use of the names Ohlandt and Perle (the "Ohlandt brand") and goodwill associated therewith in Greeley's ongoing practice of law.  In particular, it fails to take into account how Greeley's ongoing use of the Ohlandt brand minimized the risk and disruption that otherwise would have threatened both foreign associate and domestic client bases at OGP, as well as the additional business opportunities provided to Greeley from the brand that had been built over almost three decades.  An appropriate valuation must take into account the cash flow at risk to Greeley and the opportunities for new business.  The Report, by contrast, minimizes the risks to Greeley, fails to address several components of business that remained and, contrary to Greeley's overt acts, minimizes the value of the brand.  The errors are compounded by use of a "relief from royalty" approach that makes no sense in the context of this assignment, and which is applied only to a small segment of the business.  The errors are further compounded by the use of a nominal 2% royalty rate, which is at the very bottom of even the otherwise flawed comparables cited by the Appraiser.

3.      An appropriate valuation, based on historical data (Scenario II) and the legitimate cash flow expected from Greeley's ongoing use of the brand, would be significantly higher, as indicated in Attachment A to this Objection.  For example, if the valuation used a 30% royalty rate (the typical rate cited by the Appraiser for law firm referrals) applied just against foreign associate revenue of Greeley's client base while using the Appraiser's same assumptions, the resulting valuation would be between $577,408 and $821,971 (midpoint $*699,690*).  If the valuation used all of the Appraiser's assumptions with the exception of applying a 10% royalty rate to all (including domestic) Greeley revenues, the resulting valuation would be between $855,770 and $1,218,233 (midpoint $*1,037,002*).

**DISCUSSION**

**I.      The Valuation Must Be Based Solely on Historical OGRP Data (Scenario II).**

Scenario II is predicated on a "royalty base" of $603,429, representing the Appraiser's calculation of only Greeley's average annual foreign associate revenues, for the period January 2019 through June 2022.  Report ¶ 56 & Tab 5.[1]  That calculation is based on data reviewed by the Examiner, who conducted a forensic accounting for that period of time, so it is the most complete and reliable data regarding OGRP's performance.

Scenario I, by contrast, is solely based on data files purportedly reflecting Greeley's post-separation foreign associate receipts that Greeley uploaded to the Appraiser portal in June 2024.  That data should be disregarded because it is untimely, unreliable and irrelevant to an appropriate valuation as of the valuation date.

First, Greeley's submission of the Scenario I data was untimely.  Significantly, in response to the Appraiser's initial information request, Greeley did not provide any financial information for the post-separation period, and the Appraiser declined to press for such information, which is consistent with the valuation being based on historical data.  As the process unfolded, this Court set a firm deadline of March 1, 2024 for the parties to complete all submissions to the Appraiser.  Again, Greeley failed to submit any post-separation financial data.  However, on June 18, 2024 – long after the Court's deadline and after the Appraiser had finished interviewing the parties – Greeley uploaded data purporting to show foreign associate receipts to OGP for the calendar year 2023 and the period January 1 through June 17, 2024.  Ruggiero did not learn of these uploads until the Appraiser circulated a draft report for comment to the parties

---

[1] As explained below we object to use of the "relief from royalty" approach, but agree that the historical foreign associate revenue is one component relevant to calculating value.

that referenced this improper data (apparently the Appraiser was unaware of the March 1, 2024

Court deadline).

Second, this data is limited to what Greeley unilaterally states is his foreign associate

revenue (and does not include any domestic client revenue).  This unverified and unreliable data

purports to show OGP's foreign associate revenue for the period after the valuation date, but

significantly, the data completely contrasts with the historical data reviewed by the Examiner.  In

fact, it is impossible to tell whether the recent data hand-picked by Greeley – with no checks or

controls by the Examiner, Appraiser or anyone else – constitutes all OGP foreign associate

revenue or omits receipts from certain associates and/or companies referred by associates.

Moreover, it does not include domestic client revenue.[2]  This improperly submitted recent OGP

foreign associate data is no more reliable than the initial, then unreviewed, historical information

that Greeley initially submitted, which after the Examiner's review, proved incomplete and

misleading.  Indeed, this recent data was never within the purview of the Examiner since the

data is past the valuation date.  The Report finds that Greeley was able to retain substantially all

foreign associate revenue.  Yet, there is no explanation in the Report for the dramatic decrease

(about 44% from 2021 to 2024) in foreign associate revenue reflected in this recent data; and

none has been noted in the Report.  Obviously, something is amiss.

---

[2] Very early in the process, Greeley provided spreadsheets for the period 2019 through May 31, 2022 that proved to be incomplete and inaccurate.  (Greeley Exhibit Two.)  Months later, far more complete data was submitted to the Examiner.  But even then, Greeley declined to upload that data to the Appraisal portal or even permit Ruggiero to do so.  Ruggiero was required to seek specific relief from the Court allowing the more accurate historical data to be supplied to the Appraisal portal, which is the data principally relied upon in Tab 5.  Moreover, the "new" data (Scenario I) itself shows dramatically lower revenues from foreign associates and thus directly contradicts the Appraiser's finding that Greeley maintained virtually all of his foreign associate revenues.

Third, reliance on the post-separation data is also inconsistent with generally accepted appraisal methodology, namely that a valuation must be premised on historical data. As a general rule, events subsequent to the valuation date should not be taken into consideration when valuing business interests. *See, e.g.,* Pratt & Niculita, Valuing A Business: The Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at 670-71. There may be unique circumstances in which subsequent events may be considered (for example, if the events were reasonably foreseeable as of the valuation date), but the Report does not cite any such circumstances.

For any one of these reasons, the valuation is improper to the extent it relies on the data of Scenario I.

## II.     The Appraiser's Methodology and Findings Are Flawed.

### A.  Scope of the Assignment

The starting point of the analysis is the Settlement Agreement, which provides that the Appraiser's task is "to appraise the monetary value of the use of the names Ohlandt and Perle and the goodwill associated therewith ***in Greeley's on-going practice of law***." Settlement Agreement § 2(B) (emphasis added). This is different from many valuations, where the appraiser's task is to determine a fair market value to a hypothetical purchaser, who is negotiating at arm's length with a hypothetical seller.[3] Thus, the key issue is the value ***to Greeley*** of his continued use of the names (Ohlandt brand) and associated goodwill, versus the

---

[3] The Report acknowledges this on several occasions. See, e.g., Report ¶ 9 (the test is "the value to a particular, specifically identified buyer or owner [in this case, OGP] of an intangible asset with consideration given to any and all ***unique benefits of the intangible asset to the identified buyer***") (emphasis added); Report ¶ 34 (same, citing Reilly & Schweihs, Valuing Intangible Assets, at p. 60).

situation where Greeley would have had to re-brand (*e.g.*, as Greeley & Associates LLP).  Stated another way, since the Ohlandt brand was instrumental in mitigating Greeley's risk of losing existing matters as well as new matters, the Appraiser's task was to fairly assess the amount of Greeley's entire business at risk, and then determine the value to Mr. Greeley of avoiding and mitigating that risk.

The Report, however, ignores the business of firm legacy clients and Ruggiero and RMM clients that remained with Greeley, thus severely understating the value to Greeley of his continued use of the Ohlandt brand, and uses methodologies that are inconsistent with identifying and calculating the value of the Ohlandt brand to Greeley specifically (rather than to a generic purchaser).  For example, the discussion in paragraphs 21 and 22 of the Report lists a variety of factors that may establish a "law firm's personal versus practice goodwill," all of which are generic factors that might impact the valuation of any law firm name to any hypothetical purchaser.  This formulation ignores the specific benefit ***to Greeley*** of his continued use of the Ohlandt brand and the goodwill associated therewith in ***his*** ongoing practice of law.

The benefit to Greeley is particularly important because of the dramatic changes resulting from the separation of the RMM practice.  Before the separation, the OGRP firm was comprised of sixteen attorneys and four paralegals, with a strong cadre of mid-level non-equity partners and associates.  Twelve attorneys, including all partners other than Greeley, joined Ruggiero at RMM.  The remaining firm consists of Greeley, who is 67 years old, two attorneys well into their 70's (one of whom appears to be semi-retired in Florida), two associates and one paralegal listed on the website, none of whom have any meaningful independent revenue generation.  First, the continuation of the Ohlandt brand allows Greeley to convey the impression to foreign associates that the firm was proceeding as if it were business as usual, and avoid the disclosures to clients

that would be required with a new or rebranded firm, and the consequent loss of business should the foreign associates or their clients or domestic clients elect not to move to his new or rebranded firm.  Second, the continuation of the Ohlandt brand allows Greeley to sell a false business as usual narrative to his domestic (as well as foreign) clients, avoiding client decisions to transfer business.  Third, the avoidance of a name change allowed Greeley to simply keep domestic and foreign associate work attributable to clients originated by Ruggiero and RMM attorneys who declined for various reasons to take the steps necessary to shift the work to RMM, as well as legacy firm clients.

## B. The Report Minimizes the Value and Marketing Strength of the Ohlandt Brand

The Report asserts that the value of law firm brands in general and the value of the Ohlandt brand in particular have "minimal importance." (Report ¶ 18, at p. 11.)  The Report, however, fails to address undisputed evidence to the contrary.  Ruggiero introduced respected, competent and independent evidence that established the importance of law firm brands in the area of intellectual property, and of the Ohlandt brand in particular.  This included the declaration of Anthony Pluckrose, Senior Partner of a leading UK intellectual property firm, who discusses in detail the value of brand names for foreign law firms and their importance to his recommendations to clients.  (*See* Pluckrose Decl. ¶¶ 2-13, 17-20.)  Mr. Pluckrose made clear that many foreign associates choose law firms based on the reputation of the firm, rather than the reputation of individual attorneys within the firm.  (*Id*. ¶ 5.)  Mr. Pluckrose explained that this general observation applies specifically to the name Ohlandt.  As he stated, the former OGRP "has enjoyed an excellent reputation as a boutique patent prosecution and trademark firm." (*Id.* ¶ 14.)  "The firm OGRP in my experience is often referred to as 'Ohlandt Greeley' or 'the Ohlandt' firm, since it is unusual to use the full name of a firm, particularly in conversation. . . .

Therefore, the reputation of OGRP and the goodwill developed in the firm's name is connected to the names 'Ohlandt Greeley' or 'Ohlandt'…." (*Id. ¶ 15.*)

      Mr. Pluckrose's comments are echoed by Colm Dobbyn, the former Executive Vice President and General Counsel for IP for MasterCard. Mr. Dobbyn states that in his experience "I observed a general tendency in the industry to award intellectual property work to law firms with historical names and goodwill that dates back generations. . . . Intellectual property firms . . . tend to tout their longevity and brand in order to retain their client relationships." (Dobbyn Decl. ¶ 7.)

      The Ohlandt brand and reputation were built over a period of almost three decades. The Report notes that consideration was given to the "significant number of years since the Subject Name partners were practicing," implying that this was a factor supporting a low valuation. (Report ¶ 18, at p. 11.) Messrs. Ohlandt and Perle both had retired by 2000 (they passed away in 2013 and 2014, respectively). But that factor, rather than diminishing the value of the names, reinforces the secondary meaning that the Ohlandt brand had acquired in the marketplace, since the firm's reputation could not be based on Messrs. Ohlandt's and Perle's individual relationships with clients. The continued use of the subject names long after the named partners stopped practicing is fully consistent with Mr. Pluckrose's and Mr. Dobbyn's comments on the value of the Ohlandt brand.

      Greeley's post-separation conduct also evidences his view of the value in his use of the names. Greeley made it a definitive deal point that he must be allowed to continue using the names. Upon Ruggiero's departure, Greeley reached out to clients claiming that the firm remained the same other than Ruggiero's departure and to assure them that it was business as usual in the Ohlandt firm. That of course was not true, as the departures to RMM constituted

about 70% of the firm's revenue and 75% of the attorney and paralegal support for the firm's practice.  Mr. Greeley also touted in his holiday cards to clients the long-standing history of the firm brand, signing the card, "Ohlandt, Greeley & Perle, LLP, since 1987."  (Examples of OGRP and OGP Branding Materials, Ex. B.)

Similarly, the OGP website continues to rely on the same branding historically used by OGRP, and even uses the OGRP graphic (with only the name Ruggiero removed).  The website touts, as OGRP had, that OGP is "a full service intellectual property law firm with the capacity to meet the varied and changing needs of a growing U.S. and international client base . . . .  We provide worldwide representation for our clients through our experienced lawyers and vast network of international law firms to secure IP protection throughout the world." (*Ogpip.com/our-firm/*, last accessed Feb. 10, 2025.)  The description of the firm does not mention Mr. Greeley individually.  The site includes generic references to the "Patent Group" and "Trademark Group" implying a broad level of support and omitting any particular attorney name (notwithstanding that all OGRP trademark expertise as of June 1, 2022 moved to RMM).

Much of the credit for the firm's brand and reputation rests with Ruggiero, who invested considerable time and personal money to establish and develop the Ohlandt brand, for the benefit of Greeley and the firm, as well as himself.  As the Report acknowledges (Report ¶ 43), Ruggiero invested about $400,000 including hosting gatherings at INTA and other conferences, using OGRP branding.  That was in addition to more than $1 million invested by Ruggiero over the years in business development of clients.  (*See* Marketing, Promotion and Business Development Expenses on Behalf of OGRP, at p. 3 and supporting exhibits.)  The current firm branding and graphics, which Greeley has continued to use at OGP, were developed by one of Ruggiero's colleagues now at RMM.

### C.  The Report Fails Adequately to Address Greeley's Business at Risk if He Were Unable to Use the Subject Names

The Report erroneously concludes that virtually all of Greeley's foreign associate business and all of his standard domestic business would be retained even if Greeley no longer had use of the Ohlandt brand, and thus had to practice law under an alternative name such as Greeley & Associates.  The evidence shows the contrary.  In reality, the firm has morphed from a deep 16-lawyer firm to essentially a solo practice of a 67-year old partner, assisted by two aged of counsels and no more than two associates.  Crucially, Greeley has been able to employ the Ohlandt brand to mask that dramatic shift.  The OGP website continues to use the historic names and branding and to represent that the firm has a diverse, sophisticated practice capable of managing domestic and international matters.  Without Greeley's continued use of the brand, a significant amount of business could well move from Greeley to another provider.

### 1.  Risk of loss of foreign associate business

The Report downplays the value of the Ohlandt brand in Greeley's retention of foreign associate business, and claims to find support for the low valuation in the fact that Greeley and Ruggiero both were able to retain a substantial amount of work from foreign associates.  (*See* Report ¶ 17, at p. 10; *see also* Report ¶¶ 28, 53.)  The reasoning, however, does not stand up to basic scrutiny.

The Report's statement that Greeley's retained nearly 100% of his foreign associate revenue, rather than being an indicator that the Ohlandt brand has no material value, proves the opposite, namely, that the ongoing use of the brand names was a valuable tool in retaining existing client relationships.  Had Greeley not enjoyed the benefit of using the names, and thus maintained the fiction that OGP was a mere continuation of the prior, well-established firm, foreign associates would have had to address transferring existing work.  As Mr. Dobbyn noted,

if Greeley was required to practice as Greeley & Associates or something similar, foreign associates would have had no choice but to notify their clients who in turn would have to choose whether to select the new Greeley firm, or RMM, or another firm.  The Report acknowledges that there are many alternative intellectual property firms that could provide similar services, which underscores the value of the Ohlandt brand to Mr. Greeley's ongoing practice.[4]  Some clients may have elected to remain with Greeley, but others certainly would have elected to engage other counsel.

The Report notes that Ruggiero was able to retain a significant amount of foreign associate business after moving to RMM, and suggests this is indicative of the fact that the names Ohlandt and Greeley had limited value.  But Ruggiero's ability to transition his foreign associate clients was a direct result of the investments that Ruggiero made over many years to sustain his client base of foreign associates – investments that Greeley refused to make as part of his own practice – which allowed him and his colleagues to mitigate (though not eliminate) the losses from no longer having the benefit of the Ohlandt brand.  As described in detail in the Pluckrose Declaration, there are substantial hurdles to clear before a foreign associate will transfer work to an attorney who moves to a different law firm.  For each client who elected to transfer to RMM, Ruggiero and his colleagues had to obtain both a *new* engagement letter and a *new* power of attorney, and the foreign associate had to determine that it was worth expending the resources and client currency to obtain client consent to the transfer.  Because of their long relationship and Ruggiero's stellar reputation, Mr. Pluckrose and his colleagues decided to

---

[4] Apparently to support a low valuation, the Report states:  "There are many intellectual property law firms in the Stamford, Connecticut area (as well as in the greater New York metro area) that would be expected to provide similar services."  (Report ¶ 71, at p. 36.)  But, the availability of alternative providers, not just in Stamford or the greater New York area, but throughout the country, underscores the threat to Greeley if he lost the value of the brand.

recommend that their clients execute **new** powers of attorney and move their business to RMM, notwithstanding what otherwise would have been reluctance to reach out to clients. (*See* Pluckrose Decl. ¶ 16.)  Other Ruggiero foreign associate clients elected to do the same.

Even so, and contrary to the finding in the Report that substantially all of Ruggiero's clients moved to RMM, a number of foreign associates who knew and worked with Ruggiero declined to transfer their business, citing the obstacles explained in the Pluckrose Declaration. Also, a number of Greeley foreign associates now send work for **new** clients to RMM; but have stated that existing work, and new work for existing clients at Ohlandt, must continue at Ohlandt for the reasons noted by Messrs. Pluckrose and Dobbyn.  A few foreign associates further commented that they would recommend, if the Ohlandt brand ended (and thus their clients needed to make a decision), to move the existing Ohlandt work to RMM or a third firm.  In his interview, Ruggiero gave specific examples of foreign associates who declined to move their work to RMM, not because of dissatisfaction with their relationships or work with Ruggiero and his colleagues, but because of the client relations issues that would be triggered if they were required to reach out to the underlying clients.  This would not have been an issue if the clients could have simply continued with what appeared to be the "same firm."[5]

### 2.  Risk of loss of domestic business

The Report also errs in concluding that use of the names Ohlandt and Perle had a *de minimis* financial benefit in retaining "standard" domestic clients (Report ¶ 17, at p. 9).  To be

---

[5] Greeley's June 2024 upload shows work done for many of those clients.  It is important to emphasize, moreover, that once a foreign associate's client executes a power of attorney, ongoing work for renewals and maintenance takes place episodically and over a long period of time.  (*See, e.g.*, Pluckrose Decl. ¶ 4.)  So, even if the power of attorney has not generated recent revenue, it should be expected to generate revenue in the future.

clear, Ruggiero did not express a "belief" (*id.*) that this is the case and, to the contrary, he provided a detailed explanation in his interviews why such business was at risk to Greeley. Further, the Report does not cite any basis for these assertions other than the "discussions" with Greeley and Ruggiero and unidentified personal experience of the Appraiser.

As noted earlier, upon the separation, the firm went from a deep, 16-lawyer practice, to a four-lawyer firm (later adding an associate) that is little more than a solo practice of a 67-year old partner, whose colleagues include two practitioners well into their 70's. Many domestic clients aware of that significant change would move more quickly to consider succession planning. As a matter of prudence, and as many clients do in such circumstances, they may elect to begin moving portions of work to a new firm (second sourcing), to diversify and be prepared to move forward upon Greeley's retirement. Ruggiero provided a specific example – the St. Onge firm – where a similar effect occurred. By retaining the Ohlandt brand name, Greeley minimized the risk of his domestic clients learning the scope and risk of the impact of the departures, including the departure of attorneys who worked for some clients. Contrary to the Report, a couple of Greeley domestic clients already have moved to RMM and, over time, other domestic clients may come to the same conclusions on their own. But there can be a time lag of years before that occurs.

The assertion in the Report is also inconsistent with Mr. Dobbyn's Declaration. As Mr. Dobbyn explained: "On the subject of transferring intellectual property work, a significant name change with a currently retained firm would likely have required, or at least invited, my department to revisit the relationship and the POA. A mere shortening of the firm name or consolidation of names, both of which are common across the industry, would not have concerned us. However, a substantial change in the firm name – such as a removal of all but one

of the named partners – would have, at the very least, led me to investigate whether the firm had undergone a restructuring and whether it would still be sufficient for our needs.  If there had been a substantial restructuring of the firm, I very likely would have reevaluated our ongoing relationship with the firm."  (Dobbyn Decl. ¶ 10.)  In other words, if OGP had to rebrand as "Greeley" because Greeley could not use the names Ohlandt, Ruggiero, or Perle, then Greeley would have had to directly confront the diminished capacity of his current firm and also persuade clients that they should move their business to Greeley.

### 3.  Other benefits from use of the names

The Report also fails to take into account other benefits to Mr. Greeley's ongoing use of the Ohlandt brand.  First, Greeley was able to retain Ruggiero office foreign associate and domestic clients, who declined to move their existing work to RMM, even though they had no relationship with Greeley.  Second, Greeley was able to retain work from Firm office clients (the umbrella office for all other work not in the Greeley and Ruggiero offices).  This includes clients originated by the eleven other OGRP attorneys who have moved to RMM and Firm Legacy clients (clients originated by OGRP attorneys who departed prior to separation).  Very significantly, the Report did not address such Legacy clients.  Two Legacy clients, Bedoukian and Aquatrols, alone account for over $300,000 in revenues, a fact not addressed in the Report.  Third, the goodwill associated with the names also has value with respect to the attraction of new clients.  The Ohlandt brand remains of value in the marketplace, and inquiries (common before the separation of the parties) likely have continued (Greeley has not produced such data) and will continue via the firm's website and general information email, especially for potential clients in Asia and abroad more generally.

**D. The Use of the Relief from Royalty Rate Approach and the Selection of the Royalty Rate Are Erroneous.**

The Report (at ¶ 39) identifies four possible approaches to valuation – the Market Approach, the Cost Approach, the Income Approach and the Relief from Royalty Approach – and summarily concludes, without any reasoned explanation, that "the Relief from Royalty Approach is the most appropriate to utilize." (Report ¶ 41.)

As the description in the Report acknowledges, the Relief from Royalty Approach seeks to determine what a party would pay in royalties if he did not own the asset and had to license it from a third party; "[c]onversely, this approach may also quantify the amount of income the owner would generate by licensing the intangible asset to others." (Report ¶ 39.) But the issue is not what income the owner of the names could generate by licensing; it is the specific value to Greeley of his continued use of the Ohlandt and Perle names and goodwill from them in his ongoing practice. In that respect, the threshold issue is to quantify the revenue and profits associated with the continuation of the existing business, as would be done in an income approach. Additionally, the cost approach provides useful data, as it reflects the investment Ruggiero has made over time in developing the brand, the benefit of which now accrues solely to Greeley.

Even assuming that the Relief from Royalty approach were appropriate, and the "Royalty Rate" were considered a proxy for valuation of the incremental income stream, the Report errs by applying a nominal rather than an economically appropriate Royalty Rate.[6]

---

[6] As discussed above, to the extent the Relief from Royalty methodology is used, the appropriate royalty base must be based on historical foreign associate revenue as reflected in Scenario II. It also must include domestic revenue since that revenue also was at risk for Greeley. Also, both foreign and domestic revenue must include revenue of other lawyers' clients that remained with Greeley's firm.

The analysis in the Report starts from the premise that there may be "negotiated royalty rates from licensing or other agreements for similar assets." (Report ¶ 62.) But there obviously are no comparable licensing agreements, and this premise misses the point of the appraisal in the Settlement Agreement, which is to determine the value to Greeley of continuing to use the Ohlandt and Perle names and thus minimize the risk of losing business.

The various examples of royalty rates cited in the Report illustrate how inapt the concept is here. The Report looks first at the rate for Celebrity licenses, which are typically in the range of between 5% and 14%. (Report ¶ 64.)[7] But the situations are entirely different. A celebrity's name and likeness might be used to enhance the marketability of an unrelated product or service (e.g., Ben Affleck's endorsement of Dunkin Donuts), but the celebrity was not instrumental to development of the brand; and no one would choose an intellectual property firm on the basis of a celebrity endorsement. Of course, no one would argue that Ohlandt or Perle was a celebrity; the value is that their names were integral to the development of a brand over a period of almost thirty years. The Report also cites trademark royalty rates for companies like Home Depot, IKEA and Kmart, and for the American Medical Association. (Report ¶ 69.) Those rates are utterly irrelevant to the analysis of the value of the names to Greeley.

Notably, the only potentially comparable rates cited in the Report are those for law firm referral fees, and they are instructive. The Report notes that law firm referral rates are often 30% or more, particularly where, as here, there is virtually no incremental cost so that the incremental

_____

[7] We have not been able to locate the 2024 edition of the Battersby & Grimes treatise cited in the Report but assume the accuracy of the citation.

profit margin on retained work would be at or close to 100%. (Report ¶¶ 66-67)[8]  Thus, applying this economic analysis, the indicated royalty rate would be the full 30-33%.

      Having identified royalty rates that are not in any way informative of the value to Greeley of the ongoing brand, the Report chooses a rate of 2%, at the ***very bottom*** of any range identified in the examples. (Report ¶ 72.)  The Report essentially ignores the far more relevant analog of professional service referrals, asserting that, "in the case of professional service referrals, a key factor in obtaining such referrals is the expected quality of the work from the law firm receiving the work. . . . Therefore, any benefit from the Subject Names would be quantified as some portion of 10%-30% – and likely a relatively small portion because relationships, technical expertise, and the quality/value of the work are of primary importance . . . ." (Report ¶ 67.)  But the source materials do not cite or rely on those factors. Instead they cite only profit margin, which strongly counsels for a higher percentage.  The higher rate should apply here because, as the Report acknowledges, there are many intellectual property law firms in the Stamford and greater New York area expected to provide similar services. (Report ¶ 71.)  But the Appraiser instead chose a rate that is a small fraction of even the lowest end of the range (10%) for professional service referrals, and that choice is both incorrect and unsupported for all of these reasons.

---

[8] The Report notes that, while 30% or 33% may be a typical referral fee, "for an estate planning firm or other firms where the profit margin is lower, it may make sense to pay a 10% or 15% referral fee." (*Id.* ¶ 66, second bullet point.)  Greeley does not have the higher administrative costs that would characterize an estate planning practice.

### III.    AN ALTERNATIVE METHODOLOGY PRODUCES A MORE REASONABLE RESULT.

An appropriate methodology for valuing the benefit to Greeley of the Ohlandt brand and associated goodwill must take into account the risk of Greeley's loss of business had he been unable to use the brand. Those include: (a) the risk that foreign associates, having to ask clients to re-execute new powers of attorney with a re-branded law firm, would consider recommending that the clients move their business to a different law firm; and (b) the risk that domestic clients would learn that the newly-branded firm was a shell of its former self and would, as good business practice, begin to consider transitioning or second sourcing work, in contemplation of Greeley's inevitable retirement or from concern that the firm lacked the resources to service all client needs. The value also should include the opportunities for new business based on inquiries from potential clients aware of the Ohlandt brand, and also Greeley's retention of domestic and foreign associate work that previously had been developed and managed by attorneys who moved from OGP.

Attached as Exhibit A are various alternative valuations that would be far more representative of the value of the Ohlandt brand names in Greeley's ongoing practice of law and the goodwill associated therewith. For simplicity, all (i) rely on the historical data (Scenario II) reviewed by the Examiner and Appraiser, (ii) apply similar assumptions and the same discount rate used by the Appraiser, and (iii) like the Appraiser's Report, include a range depending on whether a terminal value is included.[9]

---

[9] There appears to have been an error in the present value factor that the Appraiser used for the terminal value. Attachment A corrects that error, which results in an upward adjustment of about 4%.

Two approaches in particular are informative. The first assumes a royalty rate of 30% applied only against foreign associate revenue, and focuses on the acknowledged and significant risk to foreign associate revenue but does not compensate for domestic revenue. The second assumes a royalty rate of 10% applied against all revenue. Those modifications result in a valuation of the names (using valuation midpoints) of between ***$699,690*** and ***$1,037,002***.

The reasonableness of that range is corroborated by application of the cost approach. As noted above, Ruggiero (unlike Greeley, who acknowledges he did not market) expended at least $400,000 in out of pocket promotional, marketing and business development expenses for the benefit of the OGRP brand, separate and apart from over $1 million in expenses attributable principally (though not exclusively) to business development efforts, as well as thousands of invested hours in lieu of billable hours.

## CONCLUSION

The Court should sustain this Objection and should value the use of the names Ohlandt and Perle and the associated goodwill therewith in Greeley ongoing practice of law as between $699,690 and $1,037,002.

PLAINTIFF CHARLES N.J. RUGGIERO

By: */s/ Thomas D. Goldberg*
    Thomas D. Goldberg (ct04386)
    Helen Harris (ct26816)
    Day Pitney LLP
    One Stamford Plaza, 7th Floor
    263 Tresser Boulevard
    Stamford, CT 06901
    T: (203) 977-7300
    F: (203) 977-7301
    tgoldberg@daypitney.com
    hharris@daypitney.com

    *His attorneys*

Attachment A

| | NPV of Royalties (No Terminal Value) | Midpoint | NPV of Royalties (with Terminal Value) |
|---|---|---|---|
| Final Plumpe Report Tab 3 - Scenario II | $38,478 | $45,519 | $52,559 |
| Final Plumpe Report Tab 3 - Scenario II (Corrected) | $38,478 | $46,630 | $54,781 |
| Alternative 1 - Foreign Revenue and Royalty Rate 10% | $192,469 | $233,230 | $273,990 |
| Alternative 2 - Foreign Revenue and Royalty Rate 20% | $384,941 | $466,462 | $547,983 |
| Alternative 3 - Foreign Revenue and Royalty Rate 30% | $577,408 | $699,690 | $821,971 |
| Alternative 4 - Total Revenue and Royalty Rate 10% | $855,770 | $1,037,002 | $1,218,233 |

Note:
Alternatives 1 – 4 use the corrected present value factor for the terminal value which results in an upward adjustment of approximately 4 percent of the numbers in the right-hand column.